Bethel, Judge, dissenting.
Because the rule announced by the majority today is not required by statute, deprives the court of one of its basic functions, promotes and facilitates fraud, and produces a genuinely absurd result, I must respectfully dissent.
The majority misreads OCGA § 53-12-22 (b), which provides that an in terrorem provision is "void unless there is a direction in the trust instrument as to the disposition of the property if the condition in terrorem is violated," to mean that an in terrorem clause is always valid and enforceable , regardless of surrounding circumstances, if it simply contains a limitation over. The majority misreads the plain wording of the statute and misapprehends its meaning, as the statute in no way precludes a court from determining whether a trust document containing an in terrorem provision was validly created in the first instance. Rather, its patent codified purpose is to ensure that the property of the trust has someplace to go.[1]
Indeed, if the majority's interpretation of OCGA § 53-12-22 (b) were correct and an in terrorem provision in a trust document is always valid and enforceable when it contains a limitation over, then it would not make sense for there to be a carve-out for enforcement of those suits brought against an executor or trustee where the challenger is merely seeking to enforce, rather than challenge, the terms of the trust or will. See, e.g. , Sinclair v. Sinclair , 284 Ga. 500, 502 (1), 670 S.E.2d 59 (2008) ; Snook v. Sessoms , 256 Ga. 482, 482, 350 S.E.2d 237 (1986) ; Cohen v. Reisman , 203 Ga. 684, 685 (4), 48 S.E.2d 113 (1948). The majority points to no statutory authority providing immunity for such enforcement actions which most certainly are challenges to the administration of a trust.
Further, in requiring that courts blindly and unyieldingly enforce in terrorem provisions containing a limitation over, the majority elevates trust documents above all other written instruments and contracts.[2] Neither *655 binding authority nor a fair reading of the statute countenance such a result.
We are sympathetic to the argument relied upon by the majority that the judiciary should not wade into the waters of establishing public policy. In this instance, however, we believe that the public policy is self-evident, and the General Assembly has not constrained our interpretation by expressing its public policy preference in the statute.[3] "Courts exist to ascertain the truth and to apply the law to it in any given situation[.]" Winningham v. Winningham , 966 S.W.2d 48, 52 (II) (Tenn. 1998) (citation omitted). See also Parker v. Benoist , 160 So.3d 198, 204 (11) (Miss. 2015) ("The logic for a good-faith exception is simple: courts exist to determine the truth. A forfeiture clause that operates regardless of a party's good faith in bringing suit to ascertain the validity of a will frustrates the fundamental purpose of a court, which is to determine whether a will is valid or not."). The judiciary is a third and independent branch of our government and is constitutionally empowered to fulfill its duties.[4] When the legislative branch has articulated the policy of our state, we are bound to follow it. Where, as here, it has not articulated a policy, we are duty-bound to fulfill the role of the court and discern that test which serves the interests of justice. Thus, while a subordinate branch with respect to the articulation of public policy, the judiciary is not an automaton incapable of action in the absence of direction.
Relatedly, as for the General Assembly's supposed choice during the legislative process not to include a good faith probable cause exception, I must reject this use of legislative history to impute meaning not present in the plain language of the statute. Legislative history is a field of study which has value only to academics, political science students, and (perhaps) novice legislators who are trying to learn the ropes.[5] No meaning should be inferred from proposals that are not passed, as there could be any number of reasons why this occurred. Thus, contrary to the majority's assertion, the fact that the General Assembly did not adopt language existing elsewhere in some foreign or uniform code cannot be interpreted to have any meaning separate and apart from the language actually contained in the statute at issue.[6]
In construing a trust, the first aim of a court is to discern and give effect to the intent of the settlor. See OCGA § 53-12-20 (b) (1) (intent is a necessary element of establishing an express trust); OCGA § 53-12-101 (b) (property devised by a will to a trust shall be disposed of in accordance with the provisions of the trust instrument or will setting forth the trust terms). See also McPherson v. McPherson , 307 Ga. App. 548, 552 (1) (b), 705 S.E.2d 314 (2011) ("In trust *656 law, the cardinal rule is that the trustor-settlor's intention be followed." (citation omitted) ). Indeed the statute the majority purports to construe directs the court to enforce the settlor's intent. Yet the majority would deprive the court of the power to ascertain whether the document actually reflects the intent of the settlor. The majority's opinion does violence to the aim of the court in construing trusts and will render the courts of this State impotent in all future cases involving in terrorem clauses.
Under the majority's rule, those who have committed fraud or otherwise acted improperly in securing the execution of a trust document can now insulate themselves from the consequences of their actions so long as their fraudulent or improperly secured trust document contains a limitation over and an in terrorem clause. This is a gross miscarriage of justice and an abdication of the courts' responsibilities.
Courts cannot know whether a trust document, "good on its face, was made in conformity to statutory requirements," whether the settlor was of sound mind, or whether the trust document was the product of undue influence unless these matters are presented in court. See Winningham , 966 S.W.2d at 52 (II) (citation omitted). Enforcement of an in terrorem clause that would enable the settlor to "shut the door of truth and prevent the observance of the law[ ] is a mistaken public policy." Id. (citation omitted). "A different rule-an unbending one-that in no case shall an unsuccessful contestant of a [trust] escape the penalty of forfeiture of the interest given him, would sometimes not only work manifest injustice, but accomplish results that no rational [settlor] would ever contemplate." Tate v. Camp , 147 Tenn. 137, 151-152, 245 S.W. 839 (1922).
As one of our sister states that has adopted the majority rule that I would follow in this case has observed,
[I]f the rule invoked by the appellants is to be applied with no case excepted from it, those who unscrupulously play upon the feeling of the [settlor] may, with impunity, enjoy the fruits of their iniquity, and laugh in scorn at those whom they have wronged. If the condition of forfeiture is to be enforced in every case, those who improperly influence a [settlor] may boast to a child against whom he discriminated of the power they exerted over him, and of what they were able to accomplish for themselves, taunting and goading on such child to a contest; and yet if, in the end, those who so invited it, and whose conduct made it justifiable, succeed in sustaining the [trust] by retracting or denying what they said, the contestant will not only be deprived of his [distribution], but those who drew him into a contest may acquire his portion as part of their own plunder .... No [settlor], if he could speak from his grave, would declare such to have been his intention when he wrote his [trust] and tried to protect it from assault[.]
In re Friend's Estate , 209 Pa. 442, 445, 58 A. 853 (1904).
The rule announced by our Court today, taken to its extreme, would require this State's courts to enforce an in terrorem clause despite incontrovertible and undisputed proof that the trust in question was the product of coercion. Even evidence of a proverbial gun to the head of the settlor would not suffice to give courts authority to inquire into whether the document at issue reflected, at a basic level, the intent and free will of its signer. Thus, while the individual holding the proverbial gun could well be subject to criminal prosecution and conviction, he could remain safe with the knowledge that he can still enjoy the fruits of that trust from prison. Or consider the fact that affirmative evidence that a settlor was subject to a legal infirmity or had been judicially deemed incompetent prior to the date the trust was executed would be barred by the majority's rule. Such absurd outcomes resulting from the majority's tortured reading of OCGA § 53-12-22 (b) should be eschewed. "The judiciary has a duty to reject a construction of a statute which will result in unreasonable consequences or absurd results not contemplated by the legislature." Haugen v. Henry Cty. , 277 Ga. 743, 746 (2), 594 S.E.2d 324 (2004) ("one of the cardinal rules of statutory construction requires the courts to consider the consequences of any proposed interpretation and not construe the statute to reach an *657 unreasonable result unintended by the legislature. The construction of statutes must square with common sense and sound reasoning." (internal citations and punctuation omitted) ).
An in terrorem provision should be enforced where it protects the intent of the settlor, but never where it would betray it. The power to influence the conduct of beneficiaries through such a provision belongs to the settlor alone and may not be weaponized by those seeking to supplant the settlor and substitute their own desires.
The court cannot give effect to an in terrorem clause, no matter how broadly phrased,[7] where doing so would deprive the court of its basic and inherent function or would risk the court being a party to fraud. The position advanced by Trustees-that is, unyielding enforcement of an in terrorem provision-clearly allows for that possibility and strips the court of its inherent dignity and power to conduct a meaningful review. Such cannot be permitted to stand, and the courts must act so as to prevent this outcome, as the laws of a majority of states explicitly permit.[8]
For these reasons, I would vacate the judgment of the trial court and remand the case for a determination of whether the Appellants have violated the in terrorem clause by contending that the August 2013 trust document does not reflect the true intent of the settlor, and if so, whether their challenge was brought in good faith and based upon probable cause. Further, I would vacate the trial court's judgment with respect to the fiduciary duty and tortious interference claims following analysis of the validity of the August 2013 trust document.
I am authorized to state that Presiding Judge Barnes joins in this dissent and that Presiding Judge Ellington joins as to its judgment only.

Indeed, despite its clear purpose of avoiding a lapse in the trust and the majority's recognition that the statute "does not purport to embody all possible law regarding the enforceability of interrorem clauses in trusts," the majority applies the statute as if it does.

Courts have a fundamental interest and role in determining whether the document is, in fact, what it purports to be, as evidenced by those legal requirements that attend the lawful execution of many legally significant documents. See, e.g. , OCGA §§ 24-9-901 (setting forth requirement of authentication or identification as a condition precedent to admissibility of evidence), 44-2-18 (setting forth subscribing witness requirements for a deed), 53-4-20 (setting forth formalities of signing and witnessing will or codicil), 53-4-24 (setting forth affidavit requirements for a self-proved will or codicil).

The majority correctly notes that the General Assembly grants courts the ability to declare conditions in wills void as against public policy. See OCGA § 53-4-68 (a). However, elsewhere the majority rejects any notion that courts are empowered to determine public policy, particularly in situations where the legislature has been silent on a subject. The majority's concept of judicial power thus renders surplusage the public policy exception in OCGA § 53-4-68 (a).

See, e.g. , Art. 6, Sec. 1, Para. 1; Art. 1, Sec. 2, Para. 3. See also Thompson v. Talmadge , 201 Ga. 867, 874, 41 S.E.2d 883 (1947) ("Legislative power is that which declares what the law shall be; judicial is that which declares what the law is ...").

"Any attempt to discern legislative intent beyond the express language passed by a legislative body is as practical and productive as attempting to nail Jell-O to the wall." Bishop v. State , 341 Ga. App. 590, 593, 802 S.E.2d 39 (2017) (Bethel, J., concurring).

Despite its attempts to label its analysis as "statutory history," the majority relies exclusively on provisions in uniform codes and foreign jurisdictions without pointing to any element of the actual lineage of the Georgia code, including any discussion of the prior content of the statute, portions of prior law that were carried through, modified, or repealed, or amendments that were considered, adopted, or rejected in 2010. The fact that the General Assembly revised our trust code in 2010 and made changes to provisions not relevant to this question is not germane to an analysis of this statutory provision.

The language of the in terrorem provision in the August 2013 trust document is very broad and applies even to challenges brought "in good faith and with probable cause[.]"

The majority of states appear to recognize a good faith or probable cause exception to the enforcement of in terrorem provisions. See, e.g. , Alaska Stat. §§ 13.12.517, 13.16.555 ; Ariz. Rev. Stat. § 14-2517 ; Cal. Prob. Code § 21311 ; Colo. Rev. Stat. §§ 15-11-517, 15-12-905 ; South Norwalk Trust Co. v. St. John , 101 A. 961, 962-964 (Conn. 1917) ; Haw. Rev. Stat. § 560:2-517 ; Idaho Code § 15-3-905 ; In re Estate of Cocklin , 236 Iowa 98, 17 N.W.2d 129, 132-135 (II) (1945) ; Hamel v. Hamel , 296 Kan. 1060, 1075, 299 P.3d 278 (2013) ; 18-A Maine Rev. Stat. Ann. § 3-905 ; Md. Code, Estates and Trusts, § 4-413 ; Mich. Comp. Laws Ann. 700.2518, 700.3905, 700.7113 ; Minn. Stat. § 524.2-517 ; Miss. Code § 91-8-1014 ; Mont. Code § 72-2-537 ; Nev. Rev. Stat. 137.005 (4), 163.00195 (4) ; NJ Stat 3B:3-47 ; N.M. Stat. § 45-2-517 ; Ryan v. Wachovia Bank & Trust Co. , 235 N.C. 585, 588, 70 S.E.2d 853 (1952) ; N.D. Cent. Code § 30.1-20-05 ; Barr v. Dawson , 158 P.3d 1073, 1076 (Okla. Civ. App. 2007) ; 20 Pa. Cons. Stat. § 2521 ; S.C. Code § 62-3-905 ; S.D. Codified Laws §§ 29A-2-517, 29A-3-905, 55-1-46 ; Tenn. Code § 35-15-1014 ; Tex. Est. Code § 254.005, Tex. Prop. Code § 112.038 ; Utah Code §§ 75-2-515, 75-3-905 ; In re Chappell's Estate , 127 Wash. 638, 221 P. 336 (1923) ; Dutterer v. Logan , 103 W.Va. 216, 137 S.E. 1 (1927) ; Wis. Stat. § 854.19. Although this footnote makes clear that many state legislatures have codified good faith and/or probable cause exceptions into statute, we do not believe that courts are dependent upon the legislature in their efforts to protect the dignity and integrity of the judiciary's primary function: the pursuit of truth.